**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 15-cv-1044

ALVARO J. ARNAL,

Plaintiff/Counterclaim Defendant;

v.

ASPEN VIEW CONDOMINIUM ASSOCIATION, INC., a Colorado nonprofit corporation;

Defendant/Counterclaimant;

ASPEN SNOWMASS CARE, INC. D.B.A. FIRST CHOICE PROPERTIES & MANAGEMENT, INC., a Colorado corporation;

ASPEN SNOWMASS, LLC D.B.A FIRST CHOICE PROPERTIES & MANAGEMENT, a foreign limited liability company;

JACK SMITH, an Individual; and

HEATHER VICENZI, an Individual;

Defendants.

---

## PLAINTIFF'S FIRST AMENDED COMPLAINT AND JURY DEMAND

---

Plaintiff, Alvaro J. Arnal, by and through undersigned counsel, brings this action against Defendants Aspen View Condominium Association, Inc. ("AVCA"), Aspen Snowmass Care, Inc., D.B.A., First Choice Properties & Management, Inc. ("FCP"), its successor, Aspen Snowmass, LLC, D.B.A. First Choice Properties & Management ("FCP LLC"), Jack Smith and Heather Vicenzi, alleging as follows:

## NATURE OF THE ACTION

1. This action is brought pursuant to Title VIII of the Civil Rights Act of 1968, as amended by the Fair Housing Amendments Act of 1988, 42 U.S.C. §§ 3601 – 3619 ("FHA").

## INTRODUCTION

2. The Fair Housing Act of 1968 was enacted to prohibit housing discrimination for reasons of race, color, religion, and national origin.

3. In 1972, a unanimous United States Supreme Court mandated "generous construction" of the FHA "to carry out a policy that Congress considered to be of the highest priority." *Trafficante v. Metropolitan Life Ins. Co.*, 409 U.S. 205, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972).

4. In 1988, the FHA was amended to extend protection to "handicapped"[1] persons and to provide "a clear pronouncement of a national commitment to unnecessary exclusion of persons with handicaps from American mainstream. . . ." Legislative Report 1988 House Report on the Fair Housing Amendments Act, 100th Congress 2d Session, Report No. 711 to accompany H.R. 1158.

5. Under the FHA, it is unlawful to discriminate against a buyer, renter and/or "any person associated" therewith for reasons of disability. 42 U.S.C. § 3604.

6. Prohibited acts of discrimination include the refusal to make reasonable accommodations in rules, policies, practices or services, when such accommodations

[1] The term "disabled" is used synonymously.

may be necessary to afford a person with a disability equal opportunity to use and enjoy a dwelling. 42 U.S.C. § 3604(f)(3)(B).

7. The Department of Justice ("DOJ") and the Department of Housing and Urban Development ("HUD") are responsible for enforcing the FHA.

8. In furtherance of this responsibility, the agencies issued a Joint Statement which provides technical assistance regarding the rights and obligations of persons with disabilities and housing providers as it applies to reasonable accommodations. *Joint Statement of the Department of Housing and Urban Development and the Department of Justice, Reasonable Accommodations under the Fair Housing Act* ("*Joint Statement*") May 17, 2004 at 2.

9. The FHA does not prescribe the manner by which a person shall request accommodation. "[A] resident or applicant for housing makes a reasonable accommodation request whenever she makes clear to the housing provider that she is requesting an exception, change or adjustment to a rule, policy, practice, or service because of her disability." *Joint Statement* at 10.

10. Likewise, the FHA does not prescribe the process by which a housing provider shall consider such requests. *Joint Statement* at 11. Providers who elect to adopt formal procedures for processing accommodation requests are not permitted to refuse a request for accommodation on the basis that the person making the request did not follow the formal procedures they adopted. *Id.* Nor are they permitted to make unnecessary inquiries or require information that is not necessary to evaluate if a reasonable accommodation is warranted. *Joint Statement* at 11-12.

11. “A housing provider may not ordinarily inquire as to the nature and severity of an individual’s disability. . . .” *Joint Statement* at 13. In response to a request for a reasonable accommodation, a housing provider may request reliable disability-related information that (1) is necessary to verify that the person meets the FHA’s definition of disability (i.e. has a physical or mental impairment that substantially limits one or more major life activities), (2) describes the needed accommodation, and (3) shows the relationship between the person’s disability and the need for the requested accommodation. *Id.*

12. “Depending on the individual’s circumstances, information verifying that the person meets the [FHA’s] definition of disability can usually be provided by the individual himself or herself (e.g. proof that an individual under 65 years of age receives Supplemental Security Income or Social Security Disability Insurance benefits or a credible statement by the individual). A doctor or other medical professional, a peer support group, a non-medical service agency, or a reliable third party who is in a position to know about the individual’s disability may also provide verification of a disability. In most cases, an individual’s medical records or detailed information about the nature of a person’s disability is not necessary for this inquiry.” *Joint Statement* at

13. A housing provider is obliged to respond promptly to reasonable accommodation requests. Undue delay in responding to a reasonable accommodation request may be deemed a failure to accommodate in violation of the FHA. *Joint Statement* at 11.

14. “***Any person or entity*** engaging in prohibited conduct – i.e. refusing to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford a person with a disability an equal

opportunity to use and enjoy a dwelling – may be liable" unless they fall within the very narrow exceptions to the FHA's coverage. *Joint Statement* at 3 (emphasis added). Neither condominium associations, nor property management companies are exempted from the FHA's requirements.

15. With regard to the issue of service animals, the guidance provided by the DOJ and HUD is clear:

> **Example 3:** A housing provider has a 'no pets' policy. A tenant who is deaf requests that the provider allow him to keep a dog in his unit as a reasonable accommodation. The tenant explains that the dog is an assistance animal that will alert him to several sounds, including knocks at the door, sounding of the smoke detector, the telephone ringing, and cars coming into the driveway. The housing provider must make an exception to its 'no pets' policy to accommodate the tenant. *Joint Statement* at 6.

## JURISDICTION AND VENUE

16. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343 and 42 U.S.C. § 3613.

17. This Court has jurisdiction over Plaintiff's claims for declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

18. Venue is proper within this District pursuant to 28 U.S.C. § 1391.

## PARTIES

19. Plaintiff Alvaro J. Arnal ("Mr. Arnal') is a citizen of the United States and resident of the State of Colorado. Plaintiff owns, and has at all times relevant to this action owned, residential property located at 326 Midland Avenue, Unit 201, Aspen, Colorado 81611, on the premises of Aspen View Condominiums.

20. Said property is, and has been at all times relevant to this action, subject to the bylaws, rules and policies of Defendant AVCA.

21. Defendant AVCA is a Colorado non-profit corporation.

22. Said property is, and has been at all relevant times to this action, managed by Defendant FCP or its successor FCP LLC.

23. Defendant FCP was a Colorado corporation registered as Aspen Snowmass Care, Inc. d/b/a First Choice Properties & Management, Inc., dissolved after service of process and without notice to Plaintiff on October 7, 2015.

24. Defendant FCP LLC is a foreign limited liability company registered as Aspen Snowmass, LLC d/b/a First Choice Properties & Management which succeeded Aspen Snowmass Care, Inc. d/b/a First Choice Properties & Management, Inc. and currently manages Aspen View Condominiums.

25. Defendant Jack Smith was, at all times relevant to this action, a member of AVCA's Board, a citizen of the United States, and a resident of the State of Colorado.

26. Defendant Heather Vicenzi was, at all times relevant to this action, a member of AVCA's Board, a citizen of the United States, and a resident of the State of Colorado.

## **FACTUAL ALLEGATIONS**

27. Mr. Arnal is a joint-owner of a condominium unit located within the Aspen View Condominiums ("premises"). His unit is one of eighteen on the premises.

28. The premises are governed by the bylaws, rules and policies promulgated by AVCA's Board of Managers, sometimes referred to as its Board of Directors ("Board").

29. Upon information and belief, the Board is comprised of three AVCA members. At all times relevant to this lawsuit, the AVCA Board members acting on behalf of AVCA were Cliff Mohwinkel, now deceased, Defendant Jack Smith and Defendant Heather Vicenzi. Acts and omissions as they apply to AVCA were the acts and omissions of

AVCA Board members Defendant Jack Smith, Defendant Heather Vicenzi and Cliff Mohwinkel.

30. Pursuant to AVCA's Rules and Regulations, dogs are not permitted on the premises. AVCA's pet policy reads, in pertinent part, as follows:

> 10. Each unit shall be limited to one (1) domestic cat, bird, reptile or other household pet (hereinafter for brevity termed 'animal'), except that a unit may have one (1) small caged bird and one (1) additional animal. <u>Dogs</u> <u>will</u> <u>not</u> <u>be</u> <u>permitted</u> <u>on</u> <u>the</u> <u>premises</u>. . . . Permission to keep animals is revocable if the animal [sic] becomes in the sole discretion of the Board of Directors [sic] obnoxious to other owners, in which event the owner or person having control over the animal shall be given a written notice to correct the problem, or if not corrected, the owner, upon written notice, will be required to dispose of the animal. . . . (Emphasis included in the original.)

31. In September, 2013, Mr. Arnal decided to vacate his unit and rent his share of the space to off-set his share of the mortgage. He vacated the unit on September 15, 2013, making it available to lease as of October 1, 2013.

32. On October 5, 2013, Mr. Arnal was contacted by a prospective renter.

33. The prospective renter called Mr. Arnal from Florida to inquire about the unit. He forwarded photos of the unit via email. The prospective renter subsequently requested and Mr. Arnal agreed that she could lease his space beginning November 1, 2013.

34. Prior to executing the lease agreement, the prospective renter disclosed that she has a disability for which she uses a service dog. Mr. Arnal had no objection to her use of a service animal, nor any legitimate reason to reject her request to rent the unit.

35. On October 11, 2013, Mr. Arnal contacted Defendant FCP to advise of his intent to rent out his residential space, informing Ivan Perrin, CEO and Association Manager of Defendant FCP via email that the prospective tenant used a service animal:

> Hi, Ivan-
>
> I'm looking to rent out a room in my condo (unit 201) and the woman who is interested in renting let me know that she has a service dog. I know that Aspen View has a no dog policy, but what is the policy with service dogs? This dog is allowed with her in restaurants, airplanes (at her feet), anywhere she goes. I just don't want to cause an issue by telling her she can or can't move in for incorrect reasons.
>
> Thoughts? Thanks!
>
> Al Arnal

36. Mr. Perrin forwarded Mr. Arnal's email to Kim Smeins, Association Controller of Defendant FCP, with the message that "she has the reading on this."

37. On October 14, 2013, having not yet received a response, Mr. Arnal contacted Ms. Smeins via email asking her to "please advise" with regard to the service animal. She did not respond.

38. On October 16, 2013, having not yet received a response, Mr. Arnal contacted Ms. Smeins via email again, stating, "Please provide input on this soon as I need to give the applicant a decision." Ms. Smeins responded, indicating that she was "waiting to hear back from the Board[,]" and would "give [him] their response as soon as [she] heard from them."

39. On October 17, 2013, Ms. Smeins emailed Mr. Arnal to inform him that "[t]he Board will be contacting an attorney for advice on this issue. As soon as they have a response from the attorney, I will let you know."

40. The same day, October 17, 2013, Board President, Cliff Mohwinkel, sent an email advising Ms. Smeins, Mr. Arnal, the other Board members and FCP's manager that:

> Kim et al, [sic]
>
> The exigency of this whole thing baffles me. Even if we murdered someone, we have the right to legal council [sic]. . . .

41. Mr. Arnal did not receive further word from Defendant AVCA, nor Defendant FCP until October 29, 2013, when he contacted Board President, Cliff Mohwinkel, to ask if a "decision has been reached" about his prospective tenant. He informed Mr. Mohwinkel that she was "waiting to find out if she can move in come November." Mr. Mohwinkel responded that he had consulted an attorney and would "keep [Mr. Arnal] informed on anything that happens."

42. On November 6, 2013, having not yet heard from the Board, Mr. Arnal emailed Mr. Mohwinkel again. Mr. Mohwinkel did not respond.

43. On November 13, 2013, Mr. Arnal emailed all three Board members, Defendant Jack Smith, Defendant Heather Vicenzi, Cliff Mohwinkel, and Defendant FCP's Ivan Perrin, reminding them that it had been a month since he initially notified them about his prospective tenant and her service animal:

> Hi everyone-
>
> It has been a month since I initially contacted the property management and the HOA seeking guidance about a person with a service dog who was interested in renting my apartment. At this time I'm going to extend a 1-year lease to this tenant as she is still interested in renting beginning next week. All of the research I have done on this issue shows that I cannot legally discriminate against a disabled person by denying her the rental because she has a service

> dog. I am not willing to expose myself to a lawsuit because I illegally denied the rental to this tenant.
>
> Thank you,
>
> Al Arnal

44. On November 22, 2013, Mr. Arnal and the prospective renter (hereinafter "tenant") entered into a written lease agreement wherein she would pay $1250.00 per month to lease Mr. Arnal's residential space on the premises. The lease was binding through November 1, 2014, a year from the date she initially sought to assume possession.

45. Mr. Arnal did not receive a response from either Defendant regarding the tenancy until December 24, 2013.

46. On December 24, 2013, Mr. Arnal received a letter from Board President Cliff Mohwinkel, along with AVCA's new policy on assistance dogs, a list of questions he was told the Board "need[ed] [him] to answer," and a request to "visit" with Mr. Arnal, his tenant and "the service dog in question."

The letter, dated December 23, 2013, included the following:

> We have a no-dogs rule that we are bound to enforce, within the limits of the law, and we must determine, as we are legally entitled to do, whether the dog is a legitimate service dog requiring an accommodation under that rule.
>
> You have not previously provided us with any information about the dog or its owner, other than simply stating that it is a service dog. We are entitled to receive certain additional information before we can determine whether this is a service dog entitled to such an accommodation. Attached is a list of information that we request to enable us to make that determination. <u>We assume that if this is a legitimate service dog your tenant will be familiar with the information we are entitled to receive and will have no difficulty providing it.</u>
>
> <u>Please let us have this information and documentation as soon as reasonably possible, but in no event later than January 6, 2014. If we do not receive the information by then, or if we determine based on the information submitted that this</u>

> is not a service dog entitled to accommodation under the law, we will proceed with enforcement of the no-dogs rule. (Emphasis added.)

47. Acting through Defendant Jack Smith, Defendant Heather Vicenzi and Cliff Mohwinkel, the Board's requests for documents, questions and instructions of December 24, 2013, the day before Christmas, afforded Mr. Arnal's tenant seven (7) days over the holidays to supply, among other things, the following:

- A written request for accommodation directed to the Board's President
- "Reliable documentation" of her disability
- "Reliable documentation" of her disability-related need for the dog
- "Reliable documentation" of the type of disability-related assistance provided by the service dog; and
- "Documentation of training and certification, if the dog at issue is an 'assistance dog' as defined in the Association's policy relating to service dogs"

48. Defendant AVCA's new service animal policy reads, in pertinent part:

> (b) In certain circumstances and at the discretion of the Board of Managers, an individual seeking an accommodation from the Association's no dog policy, may be granted such an accommodation in the following circumstance: (1) the individual seeking accommodation has a documented disability as defined above; (2) the dog is necessary to afford an individual an equal opportunity to use and enjoy the dwelling; (3) maintaining the dog in the unit and on the premises of the Aspen View Condominiums is reasonable; (4) the individual seeking such accommodation submits his or her written request to the Board of Managers, along with reliable documentation of his or her disability, the disability-related need for the dog, and the type of disability-related assistance provided by the dog;
> …
>
> II. In determining whether maintaining a particular dog on the premises of the Aspen View Condominiums is reasonable, the Board of Managers will evaluate the facts surrounding the request and balance the needs of all parties involved and impacted by the presence of a dog on the premises.

49. On January 8, 2014, as per Defendant AVCA's request, Mr. Arnal and his tenant accepted a visit from two of AVCA's three Board members: Mr. Mohwinkel, Board President, and Heather Vicenzi.

50. Mr. Mohwinkel and Ms. Vicenzi interviewed Mr. Arnal's tenant about her disability over the course of approximately 45 minutes.

51. Upon information and belief, the tenant answered every question asked of her by Mr. Mohwinkel and Ms. Vicenzi, providing information about but not limited to:

- the nature of her disability;
- the frequency of her seizures;
- the manner by which her seizures "come on";
- the means by which she controlled her seizures throughout the years; and
- the manner by which her service dog alerts and assists her disability.

52. She was asked whether the service dog was "officially trained." The tenant confirmed she was. She was asked to produce the dog's service animal vest and certification card. She produced both.

53. The tenant also explained the process by which she received the service dog through Canine Support Teams ("CST"); how the program required her to fly to California "to get matched" with a dog appropriate for her needs; and how she was required to undergo training before she was eligible to receive the service dog.

54. Before the interview closed, the tenant demonstrated how her service dog is under voice control. Upon information and belief, the dog obeyed all commands immediately and was otherwise wholly compliant throughout the meeting.

55. On January 20, 2014, Defendant AVCA, care of Defendant FCP, sent Mr. Arnal a letter requesting additional information from the tenant, including:

> (1) the dog's "certification and evidence that he [sic] "will be helpful in preventing seizures";
>
> (2) a "[d]octor's letter that certifies that **[**the dog] is necessary to treat [the tenant's] condition <u>even though [the tenant] is not with the dog for sizable chunks of time.</u> Dr. Niebuhr [sic] was selected and is acceptable to the board." (Emphasis included in original.)

56. Said correspondence further advised Mr. Arnal that Defendant AVCA would make an exception to its "no-dogs policy," if the tenant provided the foregoing documentation <u>**and**</u> abided by the following rules:

> (1) [The dog] must wear a leash with a service dog harness at all times when it is outside unit #201 and inside the Aspen View Condominiums' common element areas (called "premises" below),
>
> (2) [The dog] must not urinate or defecate on the premises. [Tenant] or appointed dog watcher/walker must be with the dog at all times. This person must clean up the mess at <u>every</u> event.
>
> (3) [The dog] must not be a nuisance: barking and making noise, behaving in a threatening manner, or causing a nuisance that would not be acceptable for a human to make.
>
> Failure to comply with the above will trigger an automatic fine starting from the day of receipt of this notice. The fine will be $50 to you, Mr. Alvaro Arnal (owner of unit #201) for an incident during any day. An incident is defined as one or more infractions of the above rules within any day.
>
> Risk to the tenants and owners in health and safety shall not be tolerated and will trigger a notice of cease and desist, whereby failure to comply will trigger a demand by the association of removal of [the dog] immediately from the premises.

57. On January 30, 2014, Mr. Arnal responded to the Board as follows:

> Dear Board-
>
> I spoke with [the tenant] yesterday about your requests in the letter dated January 20, 2014. As there are still concerns about the validity of some of your

requests [the tenant] has asked that you contact Rosie at Canine Support Teams to help answer your questions and to get the necessary documentation that you need in order to allow [the dog] to live at Aspen View. Canine Support Teams is the organization that certified [the dog] as a service dog and they can provide you with a copy of [the dog's] certification as well as proof that [tenant] needs [the dog] because of her condition.

I also request that you talk to Rosie about the following conditions that you outlined in your letter in order to be clear on whether they can be enforced:

1) [The dog] must wear a leash with a service dog harness at all times when it is outside unit #201 and inside the Aspen View Condominiums' common elements areas (called "premises" below), [sic]

2) [The dog] must not urinate or defecate on the premises. [Tenant] or appointed dog watcher/walker must be with the dog at all the times. This person must clean up the mess at every event.

3) [The dog] must not be a nuisance: barking and making noise, behaving in a threatening manner, or causing a nuisance that would not be acceptable for a human to make.

Rosie can be contacted at (951) 301-3625. Consider this my fulfillment of your request for me to provide this information by February 5, 2014.

. . .

58. Defendant AVCA's Board's President responded the same day, directing Defendant FCP's manager Ivan Perrin as follows:

Dear Ivan,

The board has unanimously agreed that this is not an acceptable response (see below). Proceed with the fines to Mr. Arnal and attendant eviction of the dog as agreed upon and presented previously, if the appropriate response is not received in a timely manner. We believe that the attached HUB [sic] document should be sent with your letter.

Regards,

Cliff Mohwinkel
President
Aspen View Condominium Association

The AVCA Board's "unanimous" decision to "[p]roceed with the fines to Mr. Arnal and attendant eviction" of his tenant's service dog was made by Defendant Jack Smith, Defendant Heather Vicenzi and Cliff Mohwinkel. AVCA Board's instruction to Defendant FCP to "[p]roceed with the fines to Mr. Arnal and attendant eviction" of his tenant's service dog was delivered by AVCA's Board President on behalf of Board members Defendant Jack Smith and Defendant Heather Vicenzi, following a unanimous decision that he do so.

59. On or about January 31, 2014, Mr. Arnal received notice that he was being fined $50.00 per day for allowing his tenant's service dog to live in his unit.

60. On February 20, 2014, Mr. Arnal, through attorney Kristin Bailey, provided Defendant AVCA with a letter from the tenant's "AVCA Board-approved" doctor, Dr. Dewayne Niebur. It was deemed insufficient by AVCA Board members Defendant Jack Smith, Defendant Heather Vicenzi, and Cliff Mohwinkel.

61. On February 28, 2014, Defendant AVCA, acting through Board members Defendant Jack Smith, Defendant Heather Vicenzi and Cliff Mohwinkel, directed Mr. Arnal to request a second, more specific doctor's note from his tenant. Mr. Arnal notified his tenant that AVCA's Board, Defendant Jack Smith, Defendant Heather Vicenzi and Cliff Mohwinkel, deemed her doctor's note insufficient and was requiring another, more specific one. In response, she disclosed her fear that AVCA's Board's ongoing demands and "harassment" would trigger her seizure disorder and that she needed to break her lease and leave.

62. On March 4, 2014, attorney Kristin Bailey contacted Defendant AVCA's attorney on Mr. Arnal's behalf to advise that the tenant was vacating the premises on or before

April 1, 2014. She requested that Defendant AVCA remove the fines and fees it assessed against Mr. Arnal.

63. On March 7, 2014, the Board's attorney responded, in pertinent part, as follows:

> . . . the Board is willing to allow [the tenant] to maintain the presence of her dog on the Aspen View Condominiums until April 1, 2014. Please be aware that the Board is making such an allowance solely in the interest of reaching an amicable solution to this matter. Keep in mind that the fine structure of the association will still apply and that the only way to prevent these fines is to remove the dog from the premises.
>
> The Board maintains that the documentation provided by your client and his tenant are wholly unsatisfactory with regard to complying with the Association's Policy regarding service animals and the Board's request for documentation regarding [the tenant's] disability and disability-related need for maintaining the presence of a dog in your client's unit.
>
> . . .
>
> The Board's position with respect to fines is that, commencing February 20, 2014, your client became subject to fines for maintaining the presence of a dog on the premises in the amount of $50.00 per day. These fines are accruing due to the presence of a dog in your clients [sic] unit and will continue to do so up to and until the removal of the dog.
>
> . . .
>
> In addition, the Association has incurred attorney fees and costs necessary to enforce the terms of the Association's declaration and by-laws; and your client is obligated to reimburse the Association for these amounts as well. Should it become necessary, these fines and fees will be assessed against your client's unit and will constitute a lien on the same.
>
> . . .
>
> Please be advised, and make your client aware, that the Association and its Board of Managers will file an action to enforce the Association's covenants on April 2, 2014 should your client fail to remove the dog from his unit.
>
> . . .
>
> Be aware that the Board will not respond to any other requests or offers until the dog is removed from your client's unit.

64. On or about March 11, 2014, Mr. Arnal, through his attorney, provided Defendant AVCA's attorney with a second letter from AVCA Board-approved doctor, Dewayne Niebur, which reads:

> To Whom it May Concern:
>
> [Tenant] has given me permission to clarify why she has the golden retriever, [dog's name].
>
> [Tenant] has a well-documented seizure disorder which is recognized as a disability by the ADA. She benefits greatly by the assistance of [dog's name] in that the dog is able to sense an impending seizure, prepare [the tenant] for the seizure, and potentially alert others of the situation.
>
> Your understanding and compassion in the situation is [sic] greatly appreciated.

65. The tenant vacated the premises on or about March 31, 2014, nine months before the expiration of the binding lease agreement.

66. On June 5, 2014, more than two months after Mr. Arnal's tenant vacated his unit, the Defendant AVCA's Board, Defendant Jack Smith, Defendant Heather Vicenzi and Cliff Mohwinkel, executed "The Aspen View Condominium Association, Inc. Board of Managers Resolution Concerning Fines and Fees Assessed against Unit 201" ("Resolution"). In the Resolution, Defendant AVCA makes the following admissions, among others:

• That the Board received an offer from the tenant, through Mr. Arnal, to sign a release for medical records so the Board could confirm that she is a person with a disability and that the Board rejected the offer;

• That on February 20, 2014, Mr. Arnal's legal representative provided the Board with a letter from his tenant's doctor and the Board deemed such letter insufficient;

• That on March 4, 2014, Mr. Arnal's legal representative notified the Board of the tenant's intent to vacate the premises on or before April 1, 2014;

• That on March 11, 2014, Mr. Arnal's legal representative provided the Board with a second letter from Dr. Niebur which confirmed that Mr. Arnal's tenant has a seizure disorder that is a recognized disability under the Americans with Disabilities Act ("ADA") and that "she benefits greatly from the assistance of her dog as it is able to sense impending seizures and alert her to the same"; and

• That despite receipt of the second letter from tenant's doctor confirming that she has a disability and "benefits greatly from the assistance of her dog," the Board "resolved" to impose fines, fees and costs against Mr. Arnal for allowing the tenant to keep her service animal in the unit he leased to her.

67. In conjunction with the Resolution, the Board, Cliff Mohwinkel, Defendant Heather Vicenzi and Defendant Jack Smith, assessed fines in the amount of $1450.00 against Mr. Arnal on the basis that his tenant's service dog "was maintained and kept in Unit 201 without providing reliable documentation of the tenant's disability and disability related need for an assistance dog from February 20, 2014 until "at least March 31, 2014." The Board, Defendant Jack Smith, Defendant Heather Vicenzi and Cliff Mohwinkel, assessed additional costs in the amount of $4234.00 against Mr. Arnal for attorney fees they said were "necessarily incurred to enforce the Association Declaration, By-Laws, and Rules and Regulations." The Board, Defendant Jack Smith, Defendant Heather Vicenzi and Cliff Mohwinkel, declared such fines, fees and costs to "constitute a statutory lien on the unit" owned by Mr. Arnal.

68. Upon information and belief, a lien in the amount of $5684.00 was asserted and filed against Mr. Arnal's property in Pitkin County on or about July 9, 2014 by or on behalf of Defendant AVCA and/or Defendant FCP at the instruction of AVCA's Board members, Defendant Jack Smith, Defendant Heather Vicenzi and Cliff Mohowinkel.

69. On or about February 10, 2015, Mr. Arnal received a letter from Defendant AVCA's counsel that informed him, in pertinent part, as follows:

> As you know, the Association has filed a lien on your unit for unpaid assessments for fines and attorney fees stemming from your dispute with the Association over your tenant's dog and failure to provide adequate documentation of her need for a reasonable accommodation pursuant to the Fair Housing Act. The total amount of this lien is $5,684.00. This amount is accruing interest per the terms of the Association's Declaration and Bylaws at the rate of twelve percent (12%) per annum. Additionally, the Association will add to this amount any additional legal fees incurred in resolving this matter and will file an amended lien if necessary.
>
> . . .
>
> Until a reasonable resolution is reached, the lien on you [sic] unit will remain and the Association reserves the right to take any action necessary to collect the amounts stated therein.

70. On or about April 6, 2015, Mr. Arnal received a second notice of intent to file a lien against his property in the amount of $5961.02 from Defendant FCP.

**CLAIMS FOR RELIEF**

**COUNT I**

**DISCRIMINATION**

**VIOLATION OF 42 U.S.C. §§ 3601, et seq.**

(Against All Defendants)

71. Mr. Arnal re-alleges and incorporates by reference the allegations set forth above.

72. Mr. Arnal's former tenant is a "handicapped person" as defined by 42 U.S.C. § 3602(h).

73. Mr. Arnal and his tenant requested reasonable accommodation by Defendants in regard to the rules, policies, practices or services at Aspen View Condominiums because such accommodation was or may have been necessary to afford said tenant equal opportunity to use and enjoy the dwelling she rented there.

74. The proposed accommodations would not have imposed an undue financial or administrative burden on Defendants and did not require a fundamental alteration in the nature of their programs.

75. Defendants, directly or through their agents, violated federal fair housing laws as follows:

(1) Defendants discriminated in the rental of, or otherwise made unavailable or denied, a dwelling to renter because of handicap in violation of 42 U.S.C. § 3604(f)(1)(A).

(2) Defendants discriminated in the terms, conditions, or privileges of the rental of a dwelling, or in the provision of services or facilities in connection with such dwelling because of handicap in violation of 42 U.S.C. §§ 3604(f)(2) and 3604(f)(3)(B).

(3) Defendants discriminated by refusing to make reasonable accommodations in regard to rules, policies, practices, or services, when such accommodations may have been necessary to afford a person with a handicap equal opportunity to use and enjoy a dwelling in violation of 42 U.S.C. § 3604(f)(3)(B).

(4) Defendants discriminated by making statements and/or printing notice that indicates a preference, limitation or discrimination based on a protected classification in violation of 42 U.S.C. § 3604(c)

76. As a direct and proximate result of Defendants' discriminatory conduct in violation of federal fair housing laws, Plaintiff has and continues to suffer harm, including damages and losses, pecuniary and otherwise.

**COUNT II**

**RETALIATION AND INTERFERENCE**

**VIOLATION OF 42 U.S.C. § 3617**

(Against All Defendants)

77. Mr. Arnal re-alleges and incorporates by reference the allegations set forth above.

78. Mr. Arnal is an "aggrieved person," as defined by 42 U.S.C. § 3602(i).

79. Mr. Arnal exercised rights protected by 42 U.S.C. § 3601 *et seq.* and/or aided or encouraged others, namely his former tenant, to exercise or enjoy rights afforded by federal fair housing laws.

80. Defendants, directly or through their agents, engaged in retaliation, coercion, intimidation, threats, and interference because Mr. Arnal exercised rights afforded by federal fair housing laws and/or aided or encouraged the exercise of such rights by another.

81. Defendants' intentional acts, directly or through their agents, constitute discrimination proscribed by federal fair housing law.

82. Defendants' actions, directly or through their agents, were intentional, wanton, willful and taken in disregard for the rights of others.

83. As a direct and proximate result of Defendants' discriminatory conduct, Plaintiff has suffered and continues to suffer harm, including damages and losses, pecuniary and otherwise.

**COUNT III**

**INTERFERENCE (WITH CONTRACT)**

**VIOLATION OF 42 U.S.C. § 3617**

(Against All Defendants)

84. Mr. Arnal re-alleges and incorporates by reference the allegations set forth above.

85. Mr. Arnal had a valid and binding lease agreement with his former tenant.

86. Defendants knew or should have known of their contract.

87. Defendants intentionally and improperly interfered with the performance of the contract between Mr. Arnal and his tenant by inducing or otherwise causing his tenant not to perform the contract.

88. As a result of Defendants' actions, Mr. Arnal suffered loss and incurred damages, pecuniary and otherwise.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests that the Court grant the following relief:

(1) a declaratory judgment finding that Defendants' actions, as outlined above, violate the FHA, 42 U.S.C. § 3601 *et seq.*

(2) a permanent injunction enjoining Defendants and their directors, officers, agents, employees, successors and all other persons in active concert or participation with them from discriminating in the sale and rental of housing, including but not limited to making unavailable or denying dwellings to renters because of disability in violation of federal ~~and state~~ fair housing laws;

(3) a permanent injunction directing Defendants and their directors, officers, agents, employees, successors and all other persons in active concert or participation with them to take affirmative steps, including fair housing training, to remedy the effects of the illegal and discriminatory conduct described herein and to prevent similar occurrences in the future, to rescind any and all fines, fees and interest imposed against Plaintiff in connection with the underlying facts, and to remove the lien(s) placed on his property;

(4) a declaratory judgment finding that Defendants' actions, as outlined above, constituted a tortious interference with regard to Mr. Arnal's contract with his former tenant;

(5) award actual economic and compensatory damages to Mr. Arnal in an amount to be determined by the jury to fully compensate him for the economic loss, past and future pecuniary and non-pecuniary losses, humiliation, embarrassment, suffering, loss of reputation, humiliation, inconvenience, mental anguish, loss of enjoyment of life, emotional distress, and other non-pecuniary losses caused by the conduct of Defendants as alleged herein;

(6) award punitive damages to Plaintiff in an amount to be determined by the jury for the purpose of punishing Defendants for the willful, wanton and reckless conduct alleged herein and to effectively deter similar conduct in the future;

(7) award Plaintiff pre-judgment and post-judgment interest at the highest lawful rate;

(8) award Plaintiff his reasonable attorney fees and costs pursuant to 42 U.S.C. § 3613(c)(2) and/or other applicable law;

(9) an order permanently enjoining Defendants from imposing any or all special assessments, fines, fees, interest or any other costs against Mr. Arnal or his unit resulting from or imposed in connection with any damages awarded by the Court and/or Jury in this or the related lawsuit (15-cv-01439-WYD-MJW); and

(10) order such other relief as this Court deems just and equitable.

## JURY DEMAND

Trial by jury is demanded on all issues so triable as of right.

Dated: May 25, 2016

Respectfully Submitted,

*s/ Phyllis A. Roestenberg*_______
Phyllis A. Roestenberg
Law & Mediation Office of Phyllis A. Roestenberg, Esq.
217 East 7th Avenue
Denver, Colorado 80203
Telephone: (303) 955-8417
E-mail: PARoestenberg@gmail.com
Attorney for Plaintiff Alvaro Arnal

**Certificate of Service**

I hereby certify that on May 25, 2016, I electronically filed the foregoing **PLAINTIFF'S FIRST AMENDED COMPLAINT AND JURY DEMAND** with the Clerk of the Court using CM/ECF and that service was perfected on all counsel of record and interested parties through this system.

Debra J. Oppenheimer
555 Zang Street, Suite 100
Lakewood, Colorado 80228
Attorney for Defendants

J. Kevin Bridston
Sean M. Hanlon
555 Seventeenth Street, Suite 3200
Denver, Colorado 80201-8749
Attorney for Counterclaimant, AVCA

By: s/ *Phyllis A. Roestenberg*